# IN THE COURT OF APPEALS OF IOWA

———————————

No. 26-0010
Filed May 13, 2026

———————————

**In the Interest of N.F., Minor Child,**

**P.C., Father,**
Appellant.

———————————

Appeal from the Iowa District Court for Warren County,
The Honorable Mark F. Schlenker, Judge.

———————————

**AFFIRMED**

———————————

Zachary Priebe of Jeff Carter Law Offices, PC, Des Moines, attorney for
appellant.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney
General, attorneys for appellee State.

Yvonne Naanep, Des Moines, attorney and guardian ad litem for minor
child.

———————————

Considered without oral argument
by Tabor, C.J., and Chicchelly and Sandy, JJ.
Opinion by Sandy, J.

**SANDY, Judge.**

One-month-old N.F. came to the attention of the Iowa Department of Health and Human Services when he was found to have bruising to both eyes, bruising on his back, and fractured ribs while in the care of his mother. N.F. was initially placed with his father but then removed from his care following a domestic disturbance. Despite being offered services to address the department's concerns, the father did not meaningfully engage with them. The juvenile court terminated the father's parental rights under Iowa Code sections 232.116(1)(d) and (h) (2025), finding that N.F. could not safely be returned to his custody at the time of the termination hearing. On appeal, the father challenges both the statutory ground for termination and whether termination serves the child's best interests. In addition, he asks for a six-month extension towards reunification. We affirm.

## BACKGROUND FACTS AND PROCEEDINGS

N.F. was one month old when the department first took notice of him. The injuries that drew that attention—bruising to both eyes, bruising to his back, fractures to his sixth and eighth ribs—were discovered in September 2024. The child had been in the care of his mother. She was charged with child endangerment, a class "C" felony, in Warren County, later pleading to a class "D" felony and receiving probation and a five-year no-contact order with N.F. as the protected party.

N.F. was removed from his mother's care by court order and placed with his father. He remained there through November, when N.F. was found to be a child in need of assistance. At the disposition in January 2025, the department's recommendations for the father were modest: participation in SafeCare programming. The child stayed in the father's home.

That arrangement did not last long. On January 27, the State moved to modify placement. The precipitating incident was a domestic dispute at the home the father shared with his mother, where the father had been aggressively yelling and cursing at his mother while holding N.F. The confrontation escalated to the point that the paternal grandmother struck the father as he held the child, and both she and the father's teenage sister had to leave the home for their own safety. N.F. was removed from the father's care that same day and placed with his maternal great-aunt and her husband, where he has remained since.

The concerns that animated the modification were not confined to that single incident. A psychosocial evaluation and parenting assessment conducted by Susan Gauger, ACSW, LISW, on January 27 and 31, painted a more systemic picture. Gauger found that the father could appear hostile and uncooperative, was reactive when angered, and did not appear to understand why the altercation with his mother raised legitimate concerns. Her report documented N.F.'s mother's allegations that the father had held a knife to her throat and threatened her with a gun—allegations the father brushed aside on the grounds he had not been criminally charged. The report identified a pattern of dominance and control and a lack of recognition that his aggressive behaviors posed a problem. Gauger recommended referral to an anger management program and individual therapy to address stress and mood regulation.

Services were offered but there was a persistent gap between what was offered and what was accepted. The father was ordered to complete the Iowa Domestic Abuse Program (IDAP) and engage in individual mental-health therapy. He sought and initially received court-ordered funding for IDAP—only for the State to resist that request and the juvenile court to reverse its

prior ruling. The father paid for the program himself. He also began mental-health services through Eyerly Ball, where he was evaluated in April and saw a therapist for the first time in May.

The department encouraged the father to find a provider who could see him weekly, given the documented concerns about his emotional regulation. The father resisted this, stating repeatedly that he did not need therapy and could not be compelled to attend weekly. His Eyerly Ball therapist wrote a letter noting that clinic capacity limited appointments to monthly. The father construed this as a professional judgment that weekly therapy was unnecessary. The State disputed that reading, and the therapist confirmed to the case manager that he had provided the father with referrals to providers who could offer weekly sessions and that he could benefit from more frequent care. The father did not pursue those referrals. He missed a therapy appointment on August 5, cancelled another on August 27, and did not engage in any further therapy sessions after that.

His IDAP completion fared no better. In August, the father's conduct toward the program instructor was sufficiently rude and disrespectful that she contacted the department to report it. He was discharged from the program in October for exceeding the allowable number of absences and for failure to make any payments toward his program fee.

The permanency hearing was held in July. The father requested the return of N.F. to his care or, alternatively, a six-month extension of time to reunify. The juvenile court authorized the State to file a termination petition instead. That petition was filed October 1. By the time of the termination hearing in November, the father had not visited N.F. since September—nearly two months. He had also disengaged from family casework during that period. Before that withdrawal, his visits with the child had remained fully

supervised. He had cycled through five to ten jobs since the child's birth and had not maintained independent housing, residing in his mother's basement while N.F. had slept in the father's mother's bedroom. A domestic abuse protective order, obtained by the child's mother against the father, had been in effect from July 2024 through July 2025.

The mother consented to termination of her parental rights. She did not appear at the termination hearing, and she does not appeal. The juvenile court entered its order terminating parental rights to both parents on December 31, 2025. The court terminated the mother's rights under Iowa Code sections 232.116(1)(a), (d), (h), and (i), and the father's rights under sections 232.116(1)(d) and (h). The court found no statutory exception under section 232.116(3) that would counsel against termination, noting that the parent-child bond was effectively nonexistent and that N.F. had never lived with either parent for more than a few months of his short life.

The father appeals. He challenges the sufficiency of the evidence supporting termination under sections 232.116(1)(d) and (h) and contends that termination was not in N.F.'s best interests. He asks this court to reverse and remand with directions to return the child to his care.

## STANDARD OF REVIEW

We review termination-of-parental-rights cases de novo. *In re A.B.*, 957 N.W.2d 280, 293 (Iowa 2021). We are not bound by the juvenile court's fact findings, but we give them respectful consideration, especially when assessing the credibility of witnesses. *Id.*

Our review follows a three-step process of determining whether statutory grounds for termination exist, whether termination is in the child's best interests, and whether an exception should apply to prevent termination.

*Id.* at 294. We do not address any step not challenged on appeal. *In re L.A.*, 20 N.W.3d 529, 532 (Iowa Ct. App. 2025) (en banc). After addressing all challenged steps, we address any other challenges the parent raises. *Id.*

## DISCUSSION

### I. Statutory Ground for Termination

The juvenile court terminated the father's parental rights under Iowa Code section 232.116(1)(d) and (h). We focus on (h). That section permits termination if the State proves (1) the child is three years old or younger; (2) "[t]he child has been adjudicated a child in need of assistance"; (3) the child has been removed from the parent's custody for at least six of the last twelve months or for the last six consecutive months without a trial period at home of thirty days or more; and (4) the child cannot be returned to the custody of the parent at the present time. Iowa Code § 232.116(1)(h).

The father only challenges the last element—whether there is clear and convincing evidence that the child could not be returned to his custody at the time of the termination hearing. *See L.A.*, 20 N.W.3d at 532–33 (recognizing that "at the present time" as used in section 232.116(1)(h)(4) means at the time of the termination hearing). This element is satisfied if the child cannot be safely returned to the parent's custody. *In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018). Upon our de novo review of the record we agree with the juvenile court that the record supports such a finding.

The concerns driving this case were not solely about the father's housing. They were about his emotional regulation, his history of aggression, and his willingness to address both. The incident that cost him custody in the first place was but a preview of things to come. A parenting assessment conducted shortly after removal found the father hostile, uncooperative, and

6

highly reactive when angered. It documented allegations of serious prior violence against the child's mother that the father dismissed not by disputing them but by noting the absence of criminal charges. It identified a pattern of dominance and control alongside a striking lack of recognition that any of this was a problem.

The services that followed were designed to address exactly these concerns. The father was referred to IDAP and individual therapy. He engaged with both on his own terms and ultimately completed neither. He began therapy at Eyerly Ball in the spring 2025 but attended only monthly, resisted the department's encouragement to seek a provider capable of weekly sessions, and stopped going altogether after missing and cancelling appointments in August 2025. On IDAP, his conduct toward the program instructor that same month was problematic enough that she contacted the department to report it, and he was discharged from the program in October—weeks before the termination hearing—for excessive absences and nonpayment of fees.

By September, the father had stopped visiting N.F. entirely. He had not seen his son in nearly two months when he appeared at the termination hearing to argue the child should be returned to him. The visits he had attended before that point had never progressed beyond full supervision. There had been no unsupervised contact, no trial period at home, no demonstrated progression toward the kind of parenting relationship that could support a safe return.

The father argues the department moved the goalposts by pushing for weekly therapy beyond what was originally recommended, and that his home was found safe and appropriate. While a suitable physical space is a necessary condition for reunification, it is insufficient on its own. What was never

established was that N.F. would be safe inside it. The unresolved concerns about the father's anger, his resistance to services, and his eventual disengagement from both the programs and the child himself lead us to affirm the grounds for termination under Iowa Code section 232.116(1)(h).

## II.    Best Interests

To determine best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

The father contends termination is not in the child's best interests given his "participation in services" and because he has engaged in services such that he should be afforded six additional months to work toward reunification rather than permanently severing the parent-child relationship. We disagree. For reasons adequately stated above, the father has not adequately participated in services. The child has been out of both of his parents' custody for most of his life. By all accounts, he is happy and thriving in his current placement. Under these facts and circumstances, we conclude that termination of the father's parental rights is in the child's best interests.

## III.    Six-Month Extension

Lastly, the father argues alternatively that we should grant him an additional six months to work toward reunification.[1] Such an extension is permitted by statute. *See* Iowa Code § 232.117(5) (permitting the court to enter a permanency order under section 232.104 if it decides not to terminate

---

[1] The father did not raise this issue in a separate heading or cite authority to support it in his petition on appeal, *see* Iowa R. App. P. 6.903(2)(a)(8), but we assume without deciding that the issue was adequately raised to invoke appellate review.

parental rights); *see also id.* § 232.104(2)(b) (providing a permanency option of giving a parent additional time to work toward reunification). But we can grant such an extension only if we are able to identify "specific factors, conditions, or expected behavioral changes" that provide a basis for determining "that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." *Id.* § 232.104(2)(b).

Given the father's lack of participation in services, we find no evidence suggesting the need for removal will no longer exist at the end of a six-month extension. *See id.* Therefore, we cannot grant the father's request for a six-month extension to work toward reunification.

**AFFIRMED.**